IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DAVID HARTSUCH,

                Plaintiff,

v.                                                       OPINION and ORDER

ASCENSION MEDICAL GROUP–NORTHERN         20-cv-325-jdp
WISCONSIN, INC. and JENNIE LARSON,

                Defendants.

---

Plaintiff David Hartsuch is a physician who worked at Howard Young Medical Center, a hospital operated by defendant Ascension Medical Group–Northern Wisconsin, Inc. Hartsuch has sued Ascension and one of its employees for wrongful discharge and for tortious interference with his employment contract with Delta Locum Tenens, the staffing agency that placed him at the hospital. Hartsuch says that Ascension fired him for criticizing its procedures related to COVID-19.

Defendants move for summary judgment on all of Hartsuch's pending claims. Dkt. 38. (Hartsuch has withdrawn a defamation claim. *See* Dkt. 59, at 15.) Hartsuch relies on the public policy exception to Wisconsin's employment-at-will doctrine, under which a termination may be unlawful if it violates a well-defined public policy clearly established in existing law. Hartsuch's concerns over the hospital's COVID-19 protocols might have been valid ones, but his termination was prompted most directly by his repeated threats that he would not show up for his shifts. And, for reasons explained more fully in this opinion, his termination did not violate any clearly established public policy. The court will grant defendants' motion for summary judgment and close the case.

BACKGROUND

The following facts are undisputed.

Hartsuch is a physician based in Iowa who has more than 20 years of experience in emergency medicine. Defendant Ascension Medical Group–Northern Wisconsin is an affiliate of Ascension Healthcare, which operates hundreds of healthcare facilities across more than 20 states. Ascension Medical Group contracts with physicians and other healthcare staff to provide clinical services at facilities in northern Wisconsin that are part of the Ascension Healthcare family. One of the facilities served by Ascension is Howard Young Medical Center, a hospital in Woodruff, Wisconsin.

Ascension had a contract with a staffing agency called Delta Locum Tenens under which Delta would "offer[] pre-vetted healthcare providers . . . to provide services . . . on temporary assignments." Dkt. 62, ¶ 34. During the time relevant to this case, Hartsuch had a contract with Delta under which it would provide Hartsuch with locums tenens–meaning temporary–assignments.

In fall 2019, Ascension reached out to Delta to find a suitable locum tenens physician to fill a vacancy in the emergency department at Howard Young. Delta offered Hartsuch, and Heong P'ng, the medical director for emergency services, approved Hartsuch for the assignment.

On March 18, 2020, Ascension's epidemiologists and infection control specialists issued guidance relating to COVID-19 that was based on the CDC published recommendations and guidelines in effect at that time. Defendant Jennie Larson, who was the hospital's supervisor of physician-based services, emailed the guidance to the hospital's locum tenens physicians.

On March 20, Hartsuch spoke to P'ng about some concerns related to protecting against COVID-19. Hartsuch's suggestions included the use of negative pressure rooms for intubating potential COVID-19 patients and using portable HEPA air filters. Hartsuch also raised concerns about Ascension's masking and discharge policies. Hartsuch told P'ng that he wasn't sure he could "continue to work in a place that wasn't making progress" toward the improvements he had identified. Dkt. 62, ¶ 85.

On March 23, Hartsuch sent the following email to Larson:

> I have reviewed your policies and regard them as insufficient to protect the health and safety of health care workers and the patients they treat. For starters, your recommendation is that only surgical masks be w[o]rn with known COVID-19 cases unless aerosol generating procedures are being performed. The CDC also recommends the use of respirators by personnel who are caring for COVID-19 patients for prolonged periods of time.
>
> Your policy was obviously adopted to safeguard the utilization of N-95 masks rather than protect the health and safety of health care workers and their patients[.]
>
> Regarding the admission criteria for patients with COVID-19 is made without regard for the ability of patients to self-isolate at home. This is in direct opposition to the position of the CDC and WHO which state that patients not requiring hospitalization should only be discharged to home if they can indeed self-isolate. What about a 10 year old child who lives with his elderly grandparent with medical conditions. CDC and WHO guidelines would suggest that this patient not be discharged into such a situation.
>
> Your discharge instructions state that only the patient and the caregiver should remain in the house and that all others should seek alternate housing. However, it is likely that those other household members are already infected and having them seek alternate housing will merely infect other households. Very irresponsible and ultimately lead to increased cases which will tax our medical system. Studies have shown that isolation at home with a quarantine of the household is more effective at curbing the spread of disease.

> Current policy at Howard Young is to limit visitors to 2, even those in respiratory isolation. At this time no visitors should be allowed with patients in order to limit possible spread of the disease, except that those are necessary for patient care. Additionally, health care workers should social distance among themselves to prevent infecting each other. The hospital should provide scrubs that are laundered by the hospital and health care workers should not wear home dirty scrubs.
>
> On the whole, your policies are minimalist, insufficient, and give little regard to the health and safety of patients and caregivers. I would welcome the opportunity to discuss this with you and your Chief Medical Officer.

*Id.,* ¶ 95.

The next day, in the early morning hours, Hartsuch sent a follow-up email before anyone had responded to him:

> After review of the CDC guidelines for optimizing the supply of N-95 respirators, I find that your current guidelines are NOT consistent with CDC guidelines. The CDC does not recommend the use of normal surgical masks to care for patients with COVID-19 as a mechanism for conserving N-95 masks. Specifically, they recommend that N-95 masks be w[o]rn when caring for patients with COVID-19. Some conservation techniques that should be used are:
>
> 1) limit the number of patients contacts with COVID-19 patients.
>
> 2) Cohort COVID-19 patients so that there is no[] need to reuse masks[.]
>
> 3) Employ COVID-19 positive health care workers to care for COVID-19 patients.
>
> 4) Use portable germicidal air purifiers to reduce exposure to COVID-19 in the patient's room and for procedures.
>
> 5) Mitigate potential exposure by restricting exposure of health care workers who have risk factors for death from COVID-19.
>
> Again I must re-iterate that your proscribed policies are not consistent with CDC guidelines and place health care workers and patients at risk. I have spoken to Dr. P[']ng regarding the policies in force at Howard Young and have told him that if Ascension

> does not improve their safety protocols I cannot continue to work at Howard Young in good conscience. He has assured me that the Safety procedures are being improved. Your correspondence has done little to allay my concerns.
>
> I would ask that you adopt policies consistent with CDC guidelines.

*Id.*, ¶ 104.

Larson forwarded Hartsuch's emails to P'ng, who reviewed them. P'ng didn't think he could meet all of Hartsuch's demands for multiple reasons: the demands had been escalating over the last four days; Hartsuch wanted Ascension to make changes to become CDC compliant when it already was CDC compliant; and "there is a limit to how much a large hospital system can or will do to address the concerns of a single locum tenens doctor in a remote area." *Id.*, ¶ 116. Based on statements that Hartsuch made in the email and to P'ng personally, P'ng became concerned that Hartsuch would stop showing up for his shifts if his demands weren't met. As a result, P'ng directed Larson to remove Hartsuch from his remaining shifts and look for other ways to cover those shifts.

Hartsuch's claims arise under state law, but Hartsuch is a citizen of Iowa, both defendants are citizens of Wisconsin, and the amount in controversy is more than $75,000, so the court may exercise diversity jurisdiction under 28 U.S.C. § 1332.

The court will discuss additional facts as they become relevant to the analysis.

ANALYSIS

**A. Defendant Jennie Larson**

Hartsuch is suing Larson for both wrongful discharge and tortious interference. Both of these claims rest on the decision to cancel Hartsuch's shifts at the hospital. But it's undisputed

5

that P'ng made that decision, not Larson. She had no authority over Hartsuch or other physicians, Dkt. 62, ¶ 11, and Hartsuch has adduced no evidence that she participated in P'ng's decision. Although she followed P'ng's instruction to take Hartsuch off the schedule, that was a ministerial act. Hartsuch identifies no basis for holding Larson liable under these circumstances, so the court will grant defendants' motion for summary judgment on Hartsuch's claims against Larson. But even if Larson had been involved in the decision, she would be entitled to summary judgment for the same reasons as Ascension, as will be discussed below.

## B. Wrongful discharge

Hartsuch contends that Ascension violated the law by discharging him after he criticized the hospital's protocols related to COVID-19. Under Wisconsin's employee-at-will doctrine, the general rule is that "an employer may discharge an employee for good cause, for no cause, or even for cause morally wrong, without being thereby guilty of legal wrong." *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 567, 335 N.W.2d 834, 837 (1983) (internal quotation marks omitted).[1] Exceptions to this rule may be found in an employment contract or in state and federal statutes, but Hartsuch doesn't rely on any of those exceptions. Rather, he contends that defendants committed the common-law tort of wrongful discharge, which applies when "the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law." *Winkelman v. Beloit Mem'l Hosp.*, 168 Wis. 2d 12, 20, 483 N.W.2d 211, 214 (1992).

A discharge would be wrongful under the public-policy exception if it occurs because the employee either: (1) refused to violate a public policy; or (2) fulfilled an "affirmative

---

[1] Both sides assume that Wisconsin law applies, so the court has done the same. *RLI Insurance Company v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008).

obligation" imposed by the law. *Bammert v. Don's Super Valu, Inc.*, 2002 WI 85, ¶¶ 22–23, 254 Wis. 2d 347, 359, 646 N.W.2d 365, 371. In this case, Hartsuch doesn't contend that he was discharged for refusing to violate public policy. Rather, he says that he was fulfilling affirmative obligations related to the public policies of stopping the spread of COVID-19, engaging in the minimally competent practice of medicine, and following the standard of care for physicians.

Defendants seek dismissal of the wrongful discharge claim on several grounds: Hartsuch was an independent contractor for Ascension, and only employees can bring wrongful discharge claims; the asserted policy of "preventing the spread of COVID-19" isn't based on existing law because Hartsuch is relying on executive orders rather than a statute or regulation; neither of Hartsuch's asserted policies are "fundamental and well-defined"; Hartsuch wasn't fulfilling an affirmative obligation imposed by the law when he sent the emails at issue to Ascension; and Ascension didn't discharge Hartsuch for criticizing their COVID-19 policies but rather for threatening to stop working at the hospital if Ascension didn't meet his demands. All of defendants' arguments have merit, but the court will limit its discussion to two: (1) Hartsuch wasn't fulfilling an affirmative obligation imposed by the asserted policies; and (2) no reasonable jury could find that Ascension canceled Hartsuch's shifts because he complained about the protocols rather than because he threatened to stop working.

1. **Affirmative obligation**

A claim for wrongful discharge was originally limited to situations in which the employee was fired after refusing an order that would violate public policy. *See Bushko v. Miller Brewing Co.*, 134 Wis. 2d 136, 142, 396 N.W.2d 167 (1986). The supreme court later held that that an employee's "compliance with [a] specific legal mandate" or an "affirmative legal

7

obligation" can also be protected under some circumstances. *Hausman v. St. Croix Care Ctr.*, 214 Wis. 2d 655, 667, 571 N.W.2d 393, 397 (1997).

In *Hausman*, the plaintiffs were employees at a nursing home facility who were fired after they reported to facility administrators that abuse and neglect of residents were occurring at the facility. *Id.* at 660. The supreme court held that the plaintiffs' conduct was protected by a public policy "to prevent abuse or neglect of nursing home residents" that was in statutes such as Wis. Stat. § 940.295(3), which imposes criminal penalties on workers who knowingly permit abuse or neglect to occur. The court also cited Wis. Stat. § 50.07(1)(e) and Wis. Stat. § 46.90(4)(b), which prohibit nursing homes from retaliating against an employee for reporting abuse or neglect to a state or county official. "Had the plaintiffs failed to report their concerns," the court reasoned, "they could be subject to criminal prosecution." *Hausman*, 214 Wis. 2d at 667. By extending a wrongful discharge claim to protect the plaintiffs' alleged conduct, "employees would be relieved of the onerous burden of choosing between equally destructive alternatives: report and be terminated, or fail to report and be prosecuted." *Id.* at 669.

The plaintiff bears the burden of proving that the dismissal violates a clear mandate of public policy. *Kempfer v. Automated Finishing, Inc.*, 211 Wis. 2d 100, 107–08, 564 N.W.2d 692, 696 (1997). In this case, Hartsuch hasn't met his burden to show that he was fulfilling a "specific legal mandate" related to preventing the spread of COVID-19, engaging in the minimally competent practice of medicine, or following the standard of care by criticizing the hospital's COVID-19 policies.

   a. **Preventing the spread of COVID-19**

Hartsuch first cites state executive orders declaring a health emergency because of COVID-19, ordering school closures, prohibiting mass gatherings, and restricting the size of

child-care settings, and he says that the orders represent a policy of "preventing the spread of COVID-19." Dkt. 59, at 7. Hartsuch also cites information about the dangers of COVID-19 generally and with respect to physicians specifically, *see* Dkt. ¶ 63, ¶¶ 35–43, and he says that he acted "for the purpose" of preventing the spread of COVID-19, Dkt. 59, at 10.

The court doesn't question the cited facts, Hartsuch's intentions, or the importance of preventing the spread of COVID-19. But it's not enough for Hartsuch to show that he was trying to advance an important public policy. Unlike the statutes at issue in *Hausman*, the orders Hartsuch cites did not impose any obligations on *him*; they are not directed at physicians and have nothing to do with hospital protocols. "An employer is not liable for wrongful discharge merely because the employee's conduct precipitating the discharge was praiseworthy or the public derived some benefit from it." *Batteries Plus, LLC v. Mohr*, 2001 WI 80, ¶ 20, 244 Wis. 2d 559, 569–70, 628 N.W.2d 364, 370.

It is true that "the wrongful discharge cause of action encompasses public policy embodied in the spirit as well as the letter of" the law. *Winkelman*, 168 Wis. 2d at 21. But that doesn't give courts license to expand the public policy exception to the employee-at-will doctrine to protect any conduct that might advance the general purpose of a law. The Wisconsin Supreme Court has repeatedly emphasized that the public policy exception is narrow. *See Bammert*, 2002 WI 85, at ¶ 16 ("The cases have emphasized the limited scope of the exception."); *Tatge v. Chambers & Owen, Inc.*, 219 Wis. 2d 99, 115, 579 N.W.2d 217, 224 (1998) ("We have often repeated that the *Brockmeyer* public policy exception to the employment-at-will doctrine is a narrow one."). And "[t]he more a court moves beyond the terms of the statute, the more encompassing the 'narrow' public policy exception becomes." *Batteries Plus*, 2001 WI 80, at ¶ 38. In other words, the discharge must clearly violate a policy

9

that is well-defined in the law. *Id.* The court may not enforce its own notion of what it believes public policy should protect. *Strozinsky v. Sch. Dist. of Brown Deer*, 2000 WI 97, ¶ 38, 237 Wis. 2d 19, 42, 614 N.W.2d 443, 454 ("Public policy considerations invariably are vague and beg judicial caution.").

Hartsuch doesn't identify any affirmative legal obligation that he was compelled to fulfill. Rather, his claim is like the one in *Bushko*, in which the employee alleged that he was terminated for complaining about plant safety, hazardous waste disposal procedures, and record falsification. 134 Wis. 2d at 141–47. Like preventing the spread of COVID-19, those issues implicate important concerns related to health and safety. But the supreme court rejected the claim because the plaintiff couldn't point to a legal command that compelled his safety-motivated complaint. *Id.* Acting "consistent" with public policy wasn't enough. *Id.* at 141. It is the same in this case, so this part of Hartsuch's wrongful discharge claim fails.

### b. Engaging in the minimally competent practice of medicine and following the standard of care

Hartsuch next relies on regulations, statutes, and Wisconsin common law related to the standard of care for physicians. *See* Wis. Admin. Code § Med 10.01(2); Wis. Admin. Code § Med 10.03(2)(b); Wis. Stat. § 448.02.

Section 10.01 of the administrative code is titled "authority and intent," and it sets forth a general statement of policy:

> Physicians act with a high level of independence and responsibility, often in emergencies. Every physician represents the medical profession in the community and must do so in a manner worthy of the trust bestowed upon the physician and the profession. The minimally competent practice of medicine and surgery require that care of the patient is paramount. Physicians must therefore act with honesty, respect for the law, reasonable judgment, competence, and respect for patient boundaries.

Section 10.03(2)(b) defines "unprofessional conduct" as "[d]eparting from or failing to conform to the standard of minimally competent medical practice which creates an unacceptable risk of harm to a patient or the public whether or not the act or omission resulted in actual harm to any person. Section 448.02 of the statutes authorizes discipline against a physician for "unprofessional conduct."

> Hartsuch concisely summarizes his argument in one of his briefs:
>
>> Plaintiff had an affirmative duty to engage in the minimally competent practice of medicine. Wearing an effective facemask is the minimally competent practice when treating patients with a contagious and deadly disease. By warning Defendants about their unsafe COVID-19 policies, Plaintiff was fulfilling his affirmative duty to engage in the minimally competent practice of medicine.

Dkt. 32, at 9.

As an initial matter, it is not clear that the duties to engage in the minimally competent practice of medicine and follow the standard of care are "well defined" public policies within the meaning of *Brockmeyer* and its progeny. "Not every statutory, constitutional, or administrative provision invariably sets forth a clear public policy mandate." *Bammert*, 2002 WI 85, at ¶ 12. And the duties Hartsuch cites are much broader than those the Wisconsin courts have previously recognized. *See Winkelman*, 168 Wis. 2d at 18 (regulation prohibiting nurses from performing work they aren't qualified to perform); *Kempfer*, 211 Wis. 2d at 113–14 (statute imposing penalties for operating a commercial vehicle without meeting the statutory requirements); *Hausman*, 214 Wis. 2d at 667 (statute imposing penalties for knowingly permit abuse or neglect to occur); *Strozinsky*, 2000 WI 97, at ¶ 50 (tax law prohibiting employees of corporations and limited liability companies from falsifying records, accounts, and documents).

Recognizing Hartsuch's asserted public policies as "fundamental and well-defined" could be in tension with the supreme court's views that protected conduct must be "sufficiently certain to allow courts to easily identify covered cases," *Hausman*, 214 Wis. 2d and 668, and that employers must "retain sufficient flexibility to make needed personnel decisions." *Brockmeyer*, 113 Wis. 2d at 574. The term "minimally competent practice of medicine" is not self-defining; the standard of care is likewise a concept difficult to apply in the individual case. If Hartsuch prevailed on his claim, nearly any disagreement between a physician and his or her employer about patient care could give rise to a claim under the public policy exception. The supreme court has rejected other wrongful discharge claims that would rely on an employee's subjective view of a broad standard. *See Tatge v. Chambers & Owen, Inc.*, 219 Wis. 2d 99, 117–18, 579 N.W.2d 217, 225 (1998) ("Were we to apply the *Brockmeyer* exception to the facts of this case, at-will employees could indiscriminately decline to sign non-disclosure/non-compete agreements which in their own minds are 'unreasonable,' and subsequently bring a wrongful discharge claim if terminated for doing so.").

But even if both of the asserted policies were sufficiently fundamental and well-defined, the court concludes for several reasons that Hartsuch's emails weren't fulfilling an obligation to comply with any duty imposed by those policies. First, Hartsuch points to nothing in the law requiring him to complain about hospital policies that he believed were inadequate. The laws he cites are about how to practice medicine; they do not impose on physicians a duty to report or to try to influence hospital policies and procedures.[2] The Wisconsin Supreme Court

---

[2] Hartsuch's summary judgment materials don't rely on Wis. Stat. § 448.115, which imposes on physicians a duty to report certain types of misconduct by another physician, so the court doesn't consider that statute.

12

has declined to recognize a "wide-ranging whistle-blower exception" that generally protects "reporting infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare." *Hausman*, 214 Wis. 2d at 666.

Second, Hartsuch points to no evidence other than his own belief that Ascension's policies resulted in practices that fell below the standard of care or didn't qualify as the minimally competent practice of medicine. He concedes that he has no specialized training or experience in infection control, that Ascension's mask policy was consistent with CDC guidance at the time, and that he was requesting policies that went "above and beyond what the CDC and the WHO were recommending at the time." Dkt. 62, ¶¶ 86, 92, 98, 99, 102. Although he points out that the CDC has since changed its policies, he identifies no basis for finding that following the then-current CDC guidance fell below the standards Hartsuch cites simply because the CDC later revised its guidance.

Third, Hartsuch identifies no way in which Ascension prevented him from complying with his duties as he perceived them. It's undisputed that he was permitted to wear an N95 mask if that's what he believed was appropriate, *id.*, ¶ 106, and he doesn't otherwise allege that Ascension interfered with his treatment of COVID-19 patients. In fact, the hospital had not yet received any COVID-19 patients at the time Hartsuch expressed his concerns. *Id.*, ¶ 103.

Fourth, Hartsuch identifies no adverse consequences that he might have suffered if he had chosen not to complain. In concluding that that the employees' whistleblowing was protected in *Hausman*, the court noted multiple times that the employees' faced a risk of prosecution if they didn't report abuse and neglect at the nursing home. 214 Wis. 2d at 667, 669. The supreme court has since noted that the risk of prosecution "[i]nfluenc[ed] the *Hausman* decision." *Masri v. State Lab. & Indus. Rev. Comm'n*, 2014 WI 81, ¶ 53, 356 Wis. 2d

13

405, 437, 850 N.W.2d 298, 314–15. And the Wisconsin Court of Appeals has stated that an employee "must demonstrate" that she faced adverse consequences if she didn't act. *Goggins v. Rogers Mem'l Hosp. Inc.*, 2004 WI App 113, ¶ 24, 274 Wis. 2d 754, 765, 683 N.W.2d 510, 515. *See also Lewis v. Bay Indus., Inc.*, 51 F. Supp. 3d 846, 858 (E.D. Wis. 2014) (imposing same requirement). In this case, Hartsuch doesn't contend that he was confronted with a similar dilemma. Although he cites the statute that authorizes discipline against a physician for "unprofessional conduct," Wis. Stat. § 448.02, he identifies no basis for finding that he could have been disciplined for failing to complain under the circumstances of this case.

For all of these reasons, the court concludes that Hartsuch hasn't shown that he was fulfilling a legal obligation when he complained about Ascension's COVID-19 policies. Ascension is entitled to summary judgment on the wrongful discharge claim.

### 2. Reason for discharge

Even if the court assumes that firing Hartsuch for complaining about Ascension's COVID-19 protocols would violate a fundamental and well-defined public policy, no reasonable jury could find that Ascension canceled Hartsuch's shifts for complaining. Rather, the following undisputed facts show that Ascension made its decision because it was concerned that Hartsuch was going to stop showing up for work.

First, P'ng expressed no hostility when Hartsuch first raised some of his concerns. In a conversation with P'ng on March 18, 2020, Hartsuch told P'ng his ideas for protecting against COVD-19, including those related to masks and discharge instructions. In response, P'ng told Hartsuch that "Ascension was always looking for ways to improve," and he encouraged Hartsuch "to bring him new ideas, especially about COVID-19, which the scientific community was still learning about." *Id.*, ¶ 87. P'ng then began looking into obtaining portable HEPA

14

filters, which was one of Hartsuch's suggestions. *Id.*, ¶ 89. Even after Hartsuch wrote his March 23 email, which included sharp criticism of Ascension, P'ng wrote to a colleague, "He does bring up some important points which [are] being addressed." Dkt. 63, ¶ 73. Hartsuch points to no evidence that P'ng was angry about Hartsuch's criticism.[3]

Second, P'ng cancelled Hartsuch's shifts only after Hartsuch threatened multiple times to stop working at the hospital if his demands weren't met. During his March 20 conversation with P'ng, Hartsuch said that he wasn't sure he could "continue to work in a place that wasn't making progress" toward the improvements he had identified. Dkt. 62, ¶ 85. In his March 24 email, he was less equivocal, writing, "if Ascension does not improve their safety protocols, I cannot continue to work at Howard Young in good conscience." *Id.*, ¶ 104.

Third, P'ng had a legitimate concern about the consequences of Hartsuch failing to show up for work. The hospital was experiencing staffing shortages at the time, and P'ng knew from experience that it was hard to find last-minute coverage for shifts in the emergency room. *Id.*, ¶¶ 113–14. Without a physician, the ER couldn't remain open. *Id.*, ¶ 115.

Hartsuch doesn't contend that it would violate public policy for a hospital to discharge a physician for failing to come into work, and he doesn't cite evidence that Ascension had any reason for canceling his shifts other than a concern that he wouldn't show up. Instead, he says that Ascension shouldn't have assumed that he would follow through on his threat because he never said "definitively" that he wasn't coming back to work. Dkt. 59, at 11. But that's not a reasonable view. Hartsuch told P'ng multiple times that he was questioning whether he could

---

[3] Hartsuch does allege that Larson was angry about Hartsuch's emails, but, as already noted, it's undisputed that Larson wasn't involved in the decision to cancel Hartsuch's shifts, so her reaction to the emails isn't relevant.

continue working at the hospital. And Hartsuch had already told P'ng during one of their conversations that he had previously followed through on a similar threat: Hartsuch left an assignment at a different hospital because of a requirement to submit to an x-ray for a tuberculosis screening. Dkt. 62, ¶ 57. It was reasonable for Ascension to take proactive steps to help ensure that the hospital wasn't left without an emergency room physician. When deciding whether a discharge violates public policy, the court must consider whether the employee's conduct "jeopardized significant lawful interests of either the employer or of the public," which may include concerns about staffing shortages. *Reilly v. Waukesha Cty.*, 193 Wis. 2d 527, 530, 535 N.W.2d 51, 52 (Ct. App. 1995).

Hartsuch has adduced no evidence that Ascension cancelled his shifts for criticizing Ascension's COVID-19 policies. Rather, the undisputed facts show that Ascension made its decision for legitimate reasons related to the proper functioning of the hospital. Ascension is entitled to summary judgment on Hartsuch's wrongful discharge claim for that reason as well.

**C.  Tortious interference**

This claim is premised on a view that Hartsuch was the employee of Delta Locums Tenens rather than Ascension. Dkt. 59, at 11. Hartsuch contends that Ascension's decision to cancel his shifts tortiously interfered with his contract with Delta because Delta didn't pay him for the canceled shifts. But this claim fails for essentially the same reasons as the wrongful discharge claim. It would make little sense to say that Ascension had the right to cancel's Hartsuch's shifts but to then hold that Ascension could be held liable on a tortious interference theory because Delta declined to pay Hartsuch for the canceled shifts.

Even if the court assumes that Ascension's conduct qualifies as "interference," it wasn't "improper," which is one of the requirements of the claim. *Mackenzie v. Miller Brewing Co.*, 2000

WI App 48, ¶ 63, 234 Wis. 2d 1, 47, 608 N.W.2d 331, 349, aff'd, 2001 WI 23, ¶ 64, 241 Wis. 2d 700, 623 N.W.2d 739. Ascension had a right to protect its own interests in ensuring that the emergency room would be adequately staffed, even if the effect of that decision meant that Hartsuch lost a chance to earn some income. *See Hale v. Stoughton Hosp. Ass'n, Inc.,* 126 Wis. 2d 267, 282–83, 376 N.W.2d 89, 97 (Ct. App. 1985) (hospital staff's alleged interference with employment contract not improper when it was "motivated by a desire to promote the interests of the hospital in providing medical care"). Ascension is entitled to summary judgment on this claim as well.

**D. Other pending motions**

The court's summary judgment decision moots four other motions: (1) defendants' motion for partial judgment on the pleadings, Dkt. 26, which the parties completed briefing shortly before defendants filed their summary judgment motion; (2) Hartsuch's motion for leave to amend his complaint to add a request for punitive damages, Dkt. 34; (3) Hartsuch's motion to strike proposed errata changes to deposition testimony that the court didn't need to consider, Dkt. 65; and (5) the parties' motion to extend the September 24 pretrial deadlines.

ORDER

IT IS ORDERED that:

1. The motion for summary judgment filed by defendants Ascension Medical Group–Northern Wisconsin, Inc., and Jennie Larson, Dkt. 38, is GRANTED.

2. Defendants' motion for judgment on the pleadings, Dkt. 26, Hartsuch's motion for leave to amend his complaint, Dkt. 34, Hartsuch's motion to strike defendants'

proposed errata changes, Dkt. 65, and the parties' motion for an extension of time, Dkt. 68, are DENIED as moot.

3. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered August 26, 2021.

                              BY THE COURT:

                              /s/

                              _____

                              JAMES D. PETERSON
                              District Judge